UNITED STATES of America,
Plaintiff–Appellee,

v.

Richard Louis DURHAM,
Defendant–Appellant.

No. 89–30349.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 7, 1991.

Decided Aug. 6, 1991.

John Johnston, Corette, Pohlman, Allen, Black & Carlson, Butte, Mont., for defendant-appellant.

Bernard F. Hubley, Asst. U.S. Atty., Helena, Mont., for plaintiff-appellee.

Before BROWNING, CANBY and
TROTT, Circuit Judges.

CANBY, Circuit Judge:

Defendant-appellant Richard Durham appeals his conviction for possession of methamphetamine with the intent to distribute it and for using or carrying a firearm in relation to a drug trafficking offense. Durham argues that reversal is required because the government failed to comply with the Jencks Act. The district court imposed a sentence in excess of the applicable guidelines range for the drug trafficking offense. Durham appeals his sentence on the ground that the departure was unwarranted and unreasonable. We affirm the conviction, vacate the sentence, and remand for resentencing.

## BACKGROUND

On June 3, 1989, Karen Durham, Richard Durham's wife, placed an anonymous call to the Post Falls, Idaho Police Department to report that persons were either injured or dead at a farmhouse located at 2025 Highway 53 in Rathdrum, Idaho. Police who responded to the call found the bodies of Carl Wooten, Jr. and Tommy Wooten. Carl Wooten was Karen Durham's son and Tommy Wooten was her ex-brother-in-law. Karen Durham subsequently admitted that she and Richard Durham had been at the farmhouse before she placed the anonymous call to the police. Investigators who examined the farmhouse determined that the house had been used as a laboratory for the production of methamphetamine and that the Wootens had died from the inhalation of toxic fumes from the lab.

Richard Durham was arrested on June 6, 1989, at a KOA Campground in Dillon, Montana, as he attempted to start a 1977 Ford pickup truck registered to Carl Wooten, Jr. Karen Durham had parked the truck there a few days earlier. Police who searched the Ford pickup found laboratory equipment and liquid chemicals associated with the production of methamphetamine.

Durham's fingerprints were found on several jars containing the chemicals. In the vehicle driven by Durham, agents found 76 grams of 98% pure methamphetamine.

At trial, the government presented Chad Conaster, who lived near the Durhams in Utah, as its chief witness against Durham. Conaster had notified Utah authorities about the Durhams' drug activities. After Conaster testified on direct examination, the prosecutor gave Durham a report prepared by Officer Mountsier, a DEA agent in charge of the investigation. In the report, Mountsier had written, "I believe that completed statements were obtained of the investigation and were forwarded to the Great Falls resident office." Mountsier identified Officer Kelley Call, a Utah state investigator with the Weber/Morgan County Strike Force, as the one who had taken the statements. Officer Call had interviewed Conaster and his wife Leanne after the Conasters contacted Utah authorities.

After reading the report, Durham's counsel questioned Conaster about his interview with Officer Call. Conaster testified that Call had taken notes during the interview. On the basis of Conaster's testimony and the reference to statements in Agent Mountsier's report, Durham requested the trial court to strike Conaster's testimony pursuant to the Jencks Act, 18 U.S.C. § 3500 (1988), for the government's failure to provide the defense with Officer Call's notes.

In opposing the motion, the prosecutor recounted his unsuccessful attempt to obtain Officer Call's notes. An officer of the Weber/Morgan County Strike Force had searched the files for any documentation of interviews of the Conasters, but found no evidence that Conaster made any statements regarding Durham's investigation. Their files showed that Conaster had made one statement on July 19, 1989 relating to Karen Durham. On that date, defendant Durham was imprisoned in Montana on the current charges. The officer also had called other investigators and secretaries who might have relevant information. The

prosecutor reported he was unable to contact Investigator Call who was "out of touch."

The court suggested and Durham agreed to examine Agent Mountsier. Mountsier testified that Officer Call had shown him his interview notes but Mountsier did not know their contents. Mountsier further testified that Officer Call was to prepare and forward statements, but that none were received. In response to questions regarding the DEA's relationship with the Weber/Morgan County Strike Force, Mountsier testified that the two agencies were not undertaking a joint investigation. Although the agencies were exchanging information, Mountsier explained that Officer Call was working on a separate investigation to bring charges against the Durhams under a Utah state statute.

The prosecution took the position that Mountsier's report referred only to a statement by Leanne Conaster and the court agreed. The court noted that the first sentence in the report said "he" slash "she." The district court also found that Conaster had not made a statement relating to defendant Durham and, therefore, that the government never possessed the alleged statement. Accordingly, the court denied Durham's motion to strike Chad Conaster's testimony.

The trial proceeded to conviction. At sentencing,[1] the district court noted that Durham's adjusted base offense level was 24 and his criminal history category was VI. The court, however, departed upward from the recommended sentencing range of 100 to 125 months by adding six points to Durham's offense level. The addition increased the sentencing range to 168 to 210 months. The court then sentenced Durham to 210 months in custody.

## ANALYSIS

### I. Jencks Act Issues

■ Durham first challenges the district court's refusal to strike the testimony of Chad Conaster. The Jencks Act states:

After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified....

18 U.S.C. § 3500(b) (1988). If the government fails to comply with the Jencks Act, the court must strike from the record the testimony of the government witness. 18 U.S.C. § 3500(d) (1988).

Durham argues that Conaster's testimony should have been stricken from the record because the prosecutor did not produce Officer Call's notes. According to Durham, the court should have required the government to produce the notes so that it could determine whether the notes constituted a statement. Durham relies on *United States v. Harris*, 543 F.2d 1247 (9th Cir.1976) and *United States v. Spencer*, 618 F.2d 605 (9th Cir.1980). *Harris* may offer some support for Durham's position; *Spencer* does not.

In *Harris*, we held that the FBI must preserve the original notes taken by FBI agents during interviews with prospective government witnesses "[s]ince the routine disposal of potentially producible materials by the FBI amounts to a usurpation of the judicial function of determining what evidence must be produced in a criminal case...." *Id.* at 1248. In *Spencer*, we held that *Harris* did not require agents to preserve their surveillance notes. *Spencer*, 618 F.2d at 606–07. *Spencer* did *not* hold, as Durham alleges, that state as well as federal agents are required to preserve

---

1. Durham was originally sentenced on October 27, 1989 to twenty years imprisonment for the drug offense. The court imposed the ten year minimum-mandatory sentence required by statute and enhanced the sentence by ten years because Durham had a prior conviction for distribution of methamphetamine. The court sentenced Durham to five years imprisonment on the weapons charge. Because Durham had not been provided the notice required by 21 U.S.C. § 851 (1988) regarding enhancement, the sentence was vacated. A resentencing was held on May 23, 1990. At that hearing, the court resentenced Durham to five years imprisonment for the weapons offense. Durham does not appeal that sentence.

their interview notes.[2] Consequently, *Spencer* does not support Durham's assertion that the government was required to preserve and produce the interview notes taken by state investigator Call.

We believe that the more recent case of *United States v. Polizzi*, 801 F.2d 1543 (9th Cir.1986), is controlling. Under the Jencks Act, the prosecutor is required to disclose only those statements which are in the possession of the United States. 18 U.S.C. § 3500(b) (1988). In *Polizzi*, we held that, for Jencks Act purposes, a statement is in the possession of the United States when it is in the possession of the prosecutor. *Id.* at 1552. As in the present case, *Polizzi* involved statements in the possession of a state agency.

Durham contends that *Polizzi* supports his position because its holding was grounded on the fact that the defendant could obtain the statements from the district court. Durham asserts that, unlike Polizzi, he is unable to gain access to Officer Call's notes. We disagree with Durham's characterization of our holding in *Polizzi*. The Jencks Act explicitly applies only to statements "in the possession of the United States." 18 U.S.C. § 3500(a) (1988). After a thorough discussion of whether the prosecutor possessed or was aware of the witness' statements, we simply noted that the defendant could have obtained the statements himself from the district court's records.

In the present case, the district court found, and Durham concedes, that the United States was not in possession of Officer Call's notes. Thus, under *Polizzi*, the government had no obligation to provide the notes to Durham at trial. Similarly, Durham does not dispute the district court's finding that federal Agent Mountsier never received statements or notes from Officer Call. Thus, *Harris's* rule requiring federal agents to preserve or produce interview notes is inapplicable.[3] Accordingly, we conclude that the district court acted within its discretion in denying Durham's motion to strike Conaster's testimony.

## II. Sentencing Issues

At sentencing, the district court articulated numerous circumstances justifying upward departure. Durham objects to five of the circumstances: (1) past violent conduct; (2) prior misdemeanors; (3) likelihood of recidivism; (4) the death of two individuals at a methamphetamine lab in Idaho; and (5) the commission of the instant offense to conceal the commission of another offense. Durham also asserts that the extent of departure was unreasonable. The district court increased Durham's base offense by six levels and imposed a sentence that exceeded by 85 months the maximum sentence recommended by the Guidelines. In explaining how it arrived at this sentence, the court stated:

> Now, a good question here is why the Court would depart upward by six levels rather than seven or eight or rather than five or four. And the answer to that, I think, is that there must be discretion somewhere. I think that discretion lies in the District Court.

### A. Degree of Departure

■ Durham argues that the eighty-five month departure was unreasonable because the district court failed to articulate any reason to justify the amount of the increase. We agree. At the time Durham was sentenced, our decisions did not address the problem of determining the reasonableness of the degree of departure when the defendant was in the highest

---

**2.** In *Spencer*, the defendant argued that the trial court should strike the testimony of a state officer because the officer had destroyed his rough surveillance notes. The defendant asserted that *Harris* should be extended beyond the interview scenario, to require law enforcement officers to retain all rough notes made in the course of their criminal investigations. We held that the Jencks Act did not require preservation of surveillance notes. We did not address whether *Harris* required state law enforcement officers to preserve their interview notes.

**3.** We note that there is no evidence that the federal government participated in a joint investigation of Durham with Utah state officials. Consequently, we do not determine whether the rule in *Harris* would apply in such a circumstance.

criminal history category. Nonetheless, the cases clearly required the sentencing court to state its reasons for the direction and the degree of its departure. *See United States v. Todd,* 909 F.2d 395, 398 (9th Cir.1990); *United States v. Richison,* 901 F.2d 778, 781 (9th Cir.1990); *United States v. Gayou,* 901 F.2d 746, 749 (9th Cir.1990).

We refer the district court to our recent en banc decision in *United States v. Lira–Barraza,* 941 F.2d 745 (9th Cir.1991). There we made it clear that the governing statute, 18 U.S.C. § 3553(a)(6), "requires, at a minimum, that departure sentences be consistent with other sentences fixed by the Guidelines or suggested by Commission standards and policies." *Id.* at 749. We further said that "[t]o facilitate appellate review, the district court's statement should include a reasoned explanation of the extent of the departure founded on the structure, standards and policies of the Act and Guidelines." *Id.* at 751. *See also Todd,* 909 F.2d at 398.

Here, the court did not explain how it arrived at the eighty-five month departure. The court stated only that "discretion lies in the District Court." Clearly, we cannot assess the reasonableness of the court's degree of departure from the above explanation.[4] We therefore vacate the sentence imposed and remand to the district court for resentencing. If upon resentencing the district court departs from the sentencing range suggested by the Sentencing Guidelines, it must provide reasons both for its decision to depart and the degree of departure.

To facilitate Durham's resentencing, we briefly discuss Durham's remaining challenges.

### B. Grounds for Departure

Durham argues that his past violent conduct, prior misdemeanors, and likelihood of recidivism were improper bases for departure because the Sentencing Commission considered these circumstances in formulating the Guidelines. The Guidelines permit the sentencing court to impose a sentence outside the offense level range if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines ..." U.S.S.G. § 5K2.0; *see also id.* at § 4A1.3.

#### 1. *Past Violent Conduct*

■ Durham argues that the Sentencing Commission accounted for past violent acts in section 4B1.1. Section 4B1.1 designates certain persons "Career Offenders" based on their previous participation in crimes of violence or in controlled substance offenses. The section provides:

A defendant is a career offender if (1) the defendant was at least eighteen years old at the time of the instant offense, (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense, and (3) the defendant has at least two prior *felony* convictions of either a crime of violence or a controlled substance offense.

U.S.S.G. § 4B1.1 (1990) (emphasis added).

This section refers only to previous *felony* convictions. Here, the district court was concerned with Durham's prior violent *misdemeanor* offenses. Accordingly, the district court could properly consider these acts as evidence that Durham's criminal history score did not adequately represent the seriousness of his past conduct.

---

**4.** Durham also argues that the degree of departure was unreasonable because the court's reasons for departing upward differed from its reasons for explaining the degree of departure. According to Durham, the court decided to depart upward on the basis that his criminal history was not adequately represented by his criminal history category, but based its decision on the extent of departure on the nature of Dur-

ham's conduct associated with the instant offense. This contradicts Durham's assertion that the district court articulated no reasons for explaining the extent of departure. However, this portion of the transcript is not clear. Because we agree that the court *failed* to make findings justifying the degree of departure, we do not address this argument.

### 2. Prior Misdemeanors

■ Durham next argues that the district court may not consider his misdemeanor convictions as a basis for departure because the Commission adequately addressed the possibility of multiple misdemeanor sentences in the formula for computing a defendant's criminal history category. Durham notes that a maximum of four criminal history points are to be accumulated for prior misdemeanors. U.S.S.G. 4A1.1(c) (1990). We have previously rejected the substance of this argument. *See United States v. Ward*, 914 F.2d 1340 (9th Cir.1990); *United States v. Notrangelo*, 909 F.2d 363 (9th Cir.1990). Convictions which could not be used in calculating the criminal history category may be considered independently by the trial court as a basis for upward departure precisely because the calculation under the Guidelines does not adequately take into account the prior criminal record.

### 3. Likelihood of recidivism

■ Durham argues that the district court's reliance on his "propensity to commit future crimes" is nothing more than a reference to his prior criminal conduct which is already accounted for in the guidelines. According to Durham, every defendant in category VI has the same propensity to commit crime, and Durham's tendencies are no more serious than others in the same category.

We agree that a court should depart upward based on inadequate allowance for past criminal conduct in the defendant's criminal history category only in those limited cases when a defendant's record is significantly more serious than that of other defendants in the same criminal history category. *See* U.S.S.G. § 4A1.3 ("departure under this provision is warranted when the criminal history category significantly under-represents the seriousness of the defendant's criminal history *or the likelihood that the defendant will commit further crimes.*") (emphasis added). *See also United States v. Gayou*, 901 F.2d 746, 748 (9th Cir.1990); *United States v. Ramirez Acosta*, 895 F.2d 597, 601 (9th Cir. 1990); *United States v. Wells*, 878 F.2d 1232, 1233 (9th Cir.1989). Although these cases focused on a defendant's "past conduct" rather than his "likelihood to commit other offenses," the cases establish that the sentencing court must undertake the same comparison in determining whether a defendant's propensity for recidivism warrants upward departure under section 4A1.3. *See U.S. v. Singleton*, 917 F.2d 411, 413 (9th Cir.1990).

After reviewing the sentencing transcript, we conclude that the district court complied with this requirement. The district court cited Durham's extensive criminal history, his continued involvement in crime, and the increased violence of those crimes as evidence that Durham's criminal history category did not reflect his propensity to commit crime. The court found:

> [Durham's] criminal history here shows a continual involvement in violations of the law from the time he was 18 years old right up to the present time. That involvement increased since 1984 and included drug offenses, theft, destruction of property, carrying a concealed weapon. That history is a strong indication of a high likelihood that the Defendant will continue this pattern of criminal activity.

In addition, the court noted that several of Durham's past offenses involved violent acts directed at law enforcement, and stated, "I don't think that [the violent acts] are reflected in every criminal defendant who has this score having that criminal background [sic]." Under *Singleton*, we conclude that the court's findings are a sufficient basis for upward departure under section 4A1.3. *Singleton*, 917 F.2d at 413.

### C.

■ Durham next argues that there was insufficient evidence to enhance his sentence pursuant to section 5K2.9 or 5K2.1. Section 5K2.9 provides:

> If the defendant committed the offense in order to facilitate or conceal the commission of another offense, the Court may increase the sentence above the guideline range to reflect the actual seriousness of the defendant's conduct.

U.S.S.G. § 5K2.9 (1990). Durham argues that there is no evidence that he had any connection to the methamphetamine lab in Rathdrum, Idaho, and that therefore the

court abused its discretion in departing upward sentence on this basis.

The district court found that there was a connection between Durham and the methamphetamine laboratory.[5] This finding is supported by a preponderance of the evidence. The evidence also shows that Durham attempted to conceal the illegal laboratory by dismantling the lab and moving its contents. Durham and his wife went to the farmhouse after the bodies were discovered, disassembled and removed the lab, loaded the equipment into Carl Wooten's pickup truck, and drove the truck until it broke down in Dillon. The defendant later returned to the campsite to recover the truck and its contents. Clearly, Durham intended to conceal evidence of the illegal laboratory in Rathdrum. Section 5K2.9, therefore, provided a permissible basis for upward departure.

Finally, Durham argues that the district court erred in concluding that the deaths of the Wootens provided a basis for upward departure as provided in Guidelines section 5K2.1.[6] Durham argues that departure pursuant to this provision is proper only if the death in question relates to the crime of which the defendant was convicted. He cites *United States v. Salazar–Villarreal*, 872 F.2d 121 (5th Cir.1989), for this proposition. Because no death resulted from Durham's offense of conviction, he asserts that the trial court abused its discretion in relying on this factor.

It is not clear from the record whether the court relied on section 5K2.1 as a basis for departure. The court did not cite or refer to this section as it had to other sections it believed provided grounds for departure. It appears that the court mentioned the deaths of the Wootens in recalling the details surrounding the dismantling of the methamphetamine laboratory in

Rathdrum. Nonetheless, at sentencing, Durham objected to the inference of a nexus between Durham's activities and the death of the Wootens. Durham's relationship to the Wootens' death was certainly at issue.

Because we vacate and remand for resentencing, we need not decide whether the court relied on section 5K2.1 in increasing Durham's sentence. We remind the court, however, that upward departure under section 5K2.1 is proper only if the court finds that Durham "intended" or "knowingly risked" the deaths of the Wootens. U.S.S.G. § 5K2.1 (1990). On the present record, this section would not provide a basis for departure.

CONVICTION AFFIRMED; SENTENCE VACATED; REMANDED FOR RESENTENCING.

---

5. The court stated:

Again, you mentioned the deaths of these individuals. My recollection is that there was a methamphetamine laboratory in Rathdrum, Idaho. And that there were two individuals who were found dead at that methamphetamine laboratory. It may be true ... that the United States didn't prove during the trial that the Defendant had operated that laboratory and removed the drugs from there to Dillon

where they were seized. But in any event, there was a connection between the Defendant and that methamphetamine laboratory....

6. Section 5K2.1 provides:

If death resulted, the Court may increase the sentence above the authorized guideline range.

U.S.S.G. § 5K2.1 (1990).