**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**Arthur David LeMASTER,**
**Defendant–Appellant.**

**No. 94–5097.**

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 13, 1994.

Decided May 25, 1995.

Rehearing and Suggestion for Rehearing
En Banc Denied July 7, 1995.

---

Edwin J. Walbourn, III, Office of the U.S. Atty., Covington, KY, Susan J. Park (argued), U.S. Dept. of Justice, Crim. Div., Public Integrity Section, and Bruce E. Reinhart (briefed), Washington, DC, for plaintiff-appellee.

Eldred E. Adams, Jr., Adams & Adams, Louisa, KY and Alva A. Hollon, Jr. (argued

and briefed), Hollon, Hollon, Hollon & Collins, Hazard, KY, for defendant-appellant.

Before: KENNEDY and JONES, Circuit Judges; DE MASCIO,[*] District Judge.

DE MASCIO, D.J., delivered the opinion of the court, in which KENNEDY, J. joined. JONES, J. (pp. 1233–34), delivered a separate dissenting opinion.

### DE MASCIO, District Judge.

This is an appeal from a jury conviction and sentence on count III of an indictment charging Arthur David LeMaster with knowingly and willfully making false statements to an FBI agent investigating allegations of corruption in the Kentucky General Assembly in violation of 18 U.S.C. § 1001. The jury found LeMaster not guilty of committing extortion under color of official right in violation of the Hobbs Act, 18 U.S.C. § 1951 (count I) and interstate travel in aid of bribery in violation of U.S.C. § 1952 (count II). In this appeal, LeMaster contends that the district court erred in holding that the "exculpatory no" doctrine did not apply to the facts in the case; in holding that the statements he made during his March 31, 1992 interview were material; in holding that an out-of-court statement made by LeMaster to Senator Fred Bradley was inadmissible hearsay and not probative of LeMaster's state of mind; in holding that Bradley's response to that statement was irrelevant; in holding that LeMaster made false statements to the FBI to conceal his attempted extortion, justifying an upward departure; and in holding that the jury verdicts were not inconsistent and irreconcilable. We find that the district court properly declined to apply the "exculpatory no" doctrine to the facts in this case; that the statements made by defendant at his interview were material to the ongoing FBI investigation; that the court's evidentiary rulings were not erroneous; and that both the verdicts returned and the sentence imposed are consistent with the law in this circuit. Accordingly, we affirm.

### I.

At LeMaster's trial, John W. Spurrier, a lobbyist for the harness horse racing industry, was the government's principal witness. Spurrier had known LeMaster for approximately five years. During that time LeMaster was the Chairman of the Business Organization(s) and Profession(s) (BOP) Committee of the Kentucky State Senate. The 1992 Kentucky General Assembly had under consideration an omnibus horse racing bill that contained a "breed to breed" provision favored by the thoroughbred horse racing industry. This provision would have been, however, financially detrimental to the harness racing industry. This "breed to breed" provision had to first clear the BOP committee chaired by LeMaster before it could be enacted by the General Assembly.

In January 1992, Spurrier was interviewed by the FBI as part of an ancillary investigation. He told the FBI that he paid LeMaster approximately $7,000 in 1990 in exchange for favorable action on pending horse racing legislation, and that LeMaster referred to the payments as "bets." Spurrier further admitted that he and another lobbyist were planning to influence the course of the pending "breed to breed" legislation by giving gratuities to various legislators including LeMaster. Spurrier agreed to cooperate with the investigating agents.

Spurrier met with LeMaster on January 27, 1992. He was working undercover and wore a tape recorder to record his conversation with LeMaster. He told LeMaster that the harness racing industry was extremely concerned about the "breed to breed" provision in the pending legislation and was willing to pay LeMaster as much as $5,000 during the racing season to kill the proposal. Although LeMaster said that he would not accept money in exchange for a commitment, he did solicit a trip to Florida from Spurrier. The next day, Spurrier invited LeMaster to join him for a Florida weekend. It was understood that Spurrier would reimburse LeMaster's expenses. During this conversation, they again discussed the pending "breed

---

[*] The Honorable Robert E. De Mascio, United States District Judge for the Eastern District of Michigan, sitting by designation.

to breed" provision and the injurious effect it would have on harness racing.

When LeMaster flew to Florida, Spurrier drove him from the airport to the hotel. During this ride, LeMaster advised Spurrier that the cost of his flight was $906. Spurrier gave LeMaster $1,000 which LeMaster referred to as a "bet." Spurrier then agreed to give LeMaster an additional $500 the next day to cover his hotel bill. This is but the first of a series of recorded conversations played for the jury. In all, the recorded conversations between Spurrier and LeMaster supported the conclusion that LeMaster received at least $6,000 from Spurrier through payments made in both Florida and Kentucky. Each time he received a payment from Spurrier, LeMaster referred to the money as a "bet". In the end, a horse racing bill without the "breed to breed" provision was reported out of LeMaster's committee and enacted by the legislature. Spurrier told LeMaster that the legislation as passed was totally acceptable. Shortly thereafter, Spurrier gave LeMaster $2,500.

On March 31, 1992, five days after receiving the $2,500, LeMaster was interviewed by Special Agents Adams and Antle. The agents advised LeMaster in the presence of his colleague, Senator Fred Bradley, an attorney, that the FBI was investigating allegations that certain legislators were illegally receiving money in exchange for favorable votes on pending legislation. On one occasion, during the interview, LeMaster, who is an attorney familiar with criminal law, stopped the interview to consult with Senator Bradley. During the questioning, LeMaster was asked whether he was offered or accepted cash or anything else of value in 1992 from Spurrier:

Q: Did you receive any cash, gratuity, or any other thing of value from anyone on that trip? That's on the trip to uh Fort Lauderdale?

LeMaster: Uh ... Yes sir..I guess I ...

. . . . .

A: And uh uh ... you know I..I ... I went to Gulf Stream Park, to the race track and uh ... uh ... I..you know I guess I accepted lunch there at the races from uh ... uh ... I suppose the the track paid for it I don't know.

. . . . .

Q: Just to make sure that we have no confusion here, did anyone give you any cash while you were on that trip?

A: Give me cash?

Q: Um huh.

A: No, sir.

. . . . .

Q: So so in answer to that question, the only thing that comes to mind is a is a type of gratuity which would have been a day at the races or something to that effect.

A: No no sir uh ... I went out on a boat ride that Friday. Uh ... and uh ... I understood Mr. Richardson had ... owned the boat or or had a friend that had the boat. Uh ... but I didn't pay any money, buy any gasoline for the boat.

Q: Okay.

A: I don't uh ... uh ... there they had uh beverages and food on on board you know, I and I accepted that.

J.A. at 234–238. Later during the interview the agents advised LeMaster that they had tape recordings of him accepting cash from Spurrier in Florida and Kentucky. He was then asked:

Q: Do you acknowledge that you received this pay ... these payments from Spurrier?

A: No sir.

J.A. at 256. LeMaster's "no, sir" answers to the questions about receiving cash were clearly false.

## II.

Based upon case law in other circuits, LeMaster strongly urges us to apply the "exculpatory no" doctrine to 18 U.S.C. § 1001 under the circumstances of this case.[1]

1. Section 1001 provides:

*Whoever, in any matter within the jurisdiction of any department or agency of the United*

He argues that the majority of the circuit courts of appeal have adopted the doctrine and those that have would apply the doctrine to the facts in this case. Although a majority of the circuits have adopted the "exculpatory no" doctrine, their reasoning in applying the doctrine varies greatly. The Fifth Circuit, in *Paternostro v. United States*, 311 F.2d 298 (5th Cir.1962), was the first to adopt the doctrine to limit the application of § 1001. In doing so, the court approved the rationale announced in five district court cases[2] that declined to apply § 1001 to the facts under consideration. In *Paternostro*, the court summarized the principles advanced in those district court cases, stating:

> The appellant in the case at bar made no statement relating to any claim on his behalf against the United States or an agency thereof; he was not seeking to obtain or retain any official position or employment in any agency or department of the Federal Government; and he did not aggressively and deliberately initiate any positive or affirmative statement calculated to pervert legitimate functions of government. At most, ... considering all he said, the answers were mere negative responses to questions propounded to him by an investigating agent during a question and answer conference, not initiated by the appellant. We conclude that the court erred in failing to dismiss [the § 1001 count].

311 F.2d at 305.

The First Circuit followed the reasoning of *Paternostro* in adopting the "exculpatory no" limitation to § 1001. *United States v. Chevoor*, 526 F.2d 178, 183–84 (1st Cir.1975), *cert. denied*, 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976). (Defendant had presented no false claim against the government, nor was the investigation relative to a claim the government might have had against him. The defendant did not initiate anything; he merely gave negative, oral re-

sponses to the questioning). The Seventh Circuit adopted the doctrine in a very limited way in *United States v. King*, 613 F.2d 670, 674 (7th Cir.1980) ("Exculpatory no" applies only where the responses are merely "no" without affirmative discursive falsehood, under circumstances indicating that defendant is unaware that he is under investigation, is not making a claim or seeking employment). However, most of the circuits that have adopted the "exculpatory no" doctrine have gone beyond the *Paternostro* rationale. *See, e.g., United States v. Tabor*, 788 F.2d 714, 718–19 (11th Cir.1986) (Fifth Amendment concerns when applying § 1001).

In *United States v. Rose*, 570 F.2d 1358 (9th Cir.1978), the court adopted a 5–step test which must be satisfied before applying on the "exculpatory no" limitation (false statement must not involve a claim against the government; must be responsive to inquiries initiated by federal agency; statement must not impair a governmental function; statement must not have constituted a routine exercise of administrative responsibility; and a truthful answer would have incriminated the defendant). The Fourth, Eighth and Tenth Circuits have adopted this 5–step test. *United States v. Cogdell*, 844 F.2d 179, 183 (4th Cir.1988); *United States v. Taylor*, 907 F.2d 801, 805 (8th Cir.1990); *United States v. Fitzgibbon*, 619 F.2d 874, 881 (10th Cir.1980). The Second, Third and D.C. Circuits have neither adopted nor rejected the "exculpatory no" doctrine. *United States v. Cervone*, 907 F.2d 332 (2d Cir.1990), *cert. denied*, 498 U.S. 1028, 111 S.Ct. 680, 112 L.Ed.2d 672 (1991); *United States v. Barr*, 963 F.2d 641, 647 (3d Cir.) *cert. denied*, —— U.S. ——, 113 S.Ct. 811, 121 L.Ed.2d 684 (1992); *United States v. White*, 887 F.2d 267, 273 (D.C.Cir.1989). Interestingly, the Fifth Circuit, the first to adopt the doctrine, was the first to reject it. In *United States v.*

---

States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**2.** *See United States v. Allen*, 193 F.Supp. 954 (S.D.Cal.1961); *United States v. Philippe*, 173 F.Supp. 582 (S.D.N.Y.1959); *United States v. Davey*, 155 F.Supp. 175 (S.D.N.Y.1957); *United States v. Stark*, 131 F.Supp. 190 (D.Md.1955); *United States v. Levin*, 133 F.Supp. 88 (D.Colo.1953).

*Rodriguez–Rios,* 14 F.3d 1040 (5th Cir.1994) (*en banc*), the court reversed *Paternostro* and noted that the "exculpatory no" doctrine cannot be found in the plain language of § 1001; that the argument that a mere "no" is not a statement within the meaning of § 1001 lacks merit; and that § 1001 should be interpreted by its plain language, and not by a judicial reconstruction of its purpose.

To date, our Circuit has not been confronted with factual circumstances that required the court to decide whether to adopt the "exculpatory no" exception. In *United States v. Steele,* 933 F.2d 1313 (6th Cir.) (*en banc*), *cert. denied,* 502 U.S. 909, 112 S.Ct. 303, 116 L.Ed.2d 246 (1991), the court discussed the exception at great length. The court carefully analyzed § 1001 pointing out that "[a]ny limitation imposed on the application of this section—whether we label it an 'exculpatory no' exception or something else—must result from an analysis of the statutory language and legislative history in light of accepted canons of statutory construction." 933 F.2d at 1317. The court found that the plain language of § 1001 and its legislative history demonstrate "a congressional intent to expand, not limit, the scope of § 1001." 933 F.2d at 1318; *see also United States v. Bramblett,* 348 U.S. 503, 507, 75 S.Ct. 504, 507, 99 L.Ed. 594 (1955) ("[t]here is no indication in either the committee reports or in congressional debate that the scope of [Section 1001] was to be in any way restricted."). Further, the court reasoned that, like other criminal statutes, the elements that make up the offense stated in § 1001 serve to limit its application.[3] With respect to concerns over the sweeping language of § 1001, the court held that, in addition to other elements of the offense, the materiality requirement as well as prosecutorial discretion provided sufficient limitations

on the application of the section to the criminal conduct under consideration. 933 F.2d at 1321.

Based upon its detailed analysis of § 1001, the court in *Steele* stated: "[w]e decline to apply the doctrine to the facts in this case and find it unnecessary to decide whether the doctrine is viable in other circumstances." 933 F.2d at 1315. Thus, the "exculpatory no" doctrine has neither been adopted nor rejected in our circuit. Two other panels in this circuit have addressed the "exculpatory no" doctrine. *United States v. Duranseau,* 19 F.3d 1117 (6th Cir.1994); *United States v. Hubbard,* 16 F.3d 694 (6th Cir.), *cert. denied in part,* —— U.S. ——, 115 S.Ct. 417, 130 L.Ed.2d 332 (1994). In each case, the court declined to apply the doctrine.[4]

LeMaster urges us to apply the "exculpatory no" doctrine to the facts in this case because he was responding to a government investigation, and, further, during the entire exchange with special agent Antle his two false answers amounted to a mere "no sir." LeMaster argues that if the "exculpatory no" doctrine is not applied in a case like his, it would not apply in any case where defendant is responding to a government investigation. We do not reach the broader question of when, if ever, the "exculpatory no" doctrine may apply since we find that the doctrine does not apply to the facts now before us.

■ The district court concluded that LeMaster's false statements during his interview amounted to much more than merely responding "no" on two occasions. We agree. During the interview, LeMaster was first asked specifically whether he had received cash while on the Florida trip. He responded "no", and then, as part of a series of questions admitted that he received things of value in Florida as Spurrier's guest—a

---

3. There are five elements that make up the offense proscribed by § 1001: 1) the defendant made a statement; 2) the statement is false or fraudulent; 3) statement is malicious; 4) the statement was made knowingly and willfully; 5) the statement pertained to an activity within the jurisdiction of a federal agency. *Steele,* 933 F.2d at 1318–19.

4. It would seem that the panel in *Hubbard* overstated the holding of *Steele* when it stated the

"'exculpatory no' doctrine cannot be applied here because this circuit has rejected that doctrine." *Hubbard* 16 F.3d at 698. Similarly, in *Duranseau,* the panel spoke too broadly when, after citing *Steele,* it said "We have rejected [exculpatory no] doctrine in the past." 19 F.3d at 1122. In *Duranseau,* the court, however, did recognize the limited scope of *Steele* when it stated "[w]e decline to apply the exculpatory no doctrine in this case."

boat ride, food, beverages and a free day at the races. Although LeMaster's listing of the gratuities which he did receive is not false in and of itself, the response may nonetheless serve as a "false statement" for purposes of § 1001. True responses can constitute a false statement if they represent an attempt to conceal additional information required to provide a complete, accurate, and truthful response. *See United States v. Duranseau*, 19 F.3d at 1119 (Defendant did not list all of his property holdings on a financial affidavit. The failure to list other property was a false statement which supported his conviction). Thus, LeMaster's failure to include in his recitation of the gratuities he did receive, the money he received to reimburse the cost of his flight to Florida and his hotel bill, as well as the multiple cash payments from Spurrier, constituted false statements.

■ Further, we reject LeMaster's argument that his "no, sir" responses cannot support a § 1001 conviction because the word "no" does not constitute a statement within the meaning of the statute. In *Duranseau*, the defendant falsely marked the "no" box in response to a question on a financial affidavit. That response was considered one of the false statements which supported his conviction for violating § 1001. *United States v. Duranseau*, 19 F.3d at 1119. As the court stated in *Rodriguez–Rios*, "as a matter of common sense and plain meaning, the word 'no' is indeed a statement." 14 F.3d at 1044. Accordingly, we find no justification for limiting the application of § 1001 on the facts before us.

### III.

■ The district court held that LeMaster's false statements were material because they had the capacity and natural tendency to influence the course of the ongoing FBI investigation. We agree. Materiality, a required element of the offense stated in § 1001 is "not an element that must be

proved beyond a reasonable doubt, but is a judicially imposed limitation to ensure the reasonable application of a statute." *United States v. Chandler*, 752 F.2d 1148, 1151 (6th Cir.1985). A false statement is material if it "has a natural tendency to influence, or *was capable* of influencing" the actions or decisions of the involved agency. *Kungys v. United States*, 485 U.S. 759, 770, 108 S.Ct. 1537, 1546, 99 L.Ed.2d 839 (1988) (emphasis added), *citing with approval*, at 772, *United States v. Abadi*, 706 F.2d 178 (6th Cir.), *cert. denied*, 464 U.S. 821, 104 S.Ct. 86, 78 L.Ed.2d 95 (1983). Thus, materiality is a conclusion of law that must be fully supported by the evidence, direct or circumstantial. *United States v. Abadi*, 706 F.2d at 180. As such, we review a finding of materiality *de novo*. *United States v. Chandler*, 752 F.2d at 1151.

■ Here, contrary to LeMaster's contention, the record fully supports the district court finding that his false statements had the natural tendency to influence the ongoing investigation. At the start of LeMaster's interview, the FBI agents advised him that they were investigating allegations of cash payments being made to certain legislators by lobbyists. The district court heard a number of tape recordings establishing that LeMaster was one of the legislators who received large sums of cash from a lobbyist.[5] It was entirely reasonable for the district court to infer, from this and the other evidence produced at trial, that LeMaster's receipt of cash and his reason for accepting it were the very core of the FBI's investigation.[6] Further, in light of Spurrier's allegations that he gave LeMaster cash in 1990, investigation of the entire relationship between Spurrier and LeMaster was extremely material and a necessary part of the FBI's obligation to seek out the truth.

The fact that the FBI already knew that LeMaster received $6,000 in cash from Spurrier did not affect the materiality of his false statement to the FBI. "A false statement

---

5. For discussion of other aspects of this investigation, *See, United States v. Blandford*, 33 F.3d 685 (6th Cir.1994); *United States v. Wilkinson*, 26 F.3d 623 (6th Cir.1994).

6. LeMaster argues that his false responses were not material because the investigation had already concluded by the time of his interview. This is not so. Agent Antle made this clear when he stated that the purpose of any interview with a suspect is "to get information." J.A. at 163.

can be material even if the agent to whom it is made knows that it is false." *United States v. Whitaker,* 848 F.2d 914, 916 (8th Cir.1988); *United States v. Goldfine,* 538 F.2d 815, 820–21 (9th Cir.1976). *See also United States v. Chandler,* 752 F.2d at 1151 ("It is immaterial that the witness ultimately did not influence the agency."). Although they knew that LeMaster had accepted $6,000 in cash, the FBI could not have concluded its investigation prior to the interview with LeMaster. If the investigation had been terminated without interviewing Le-Master, it would have left open the possibility that LeMaster had an innocent explanation for having accepted the money from Spurrier.[7] If such an explanation was offered, the FBI had an obligation to investigate its veracity. Alternatively, the absence of a satisfactory explanation would have tended to corroborate Spurrier's allegations. Since LeMaster's responses foreclosed this critical line of questioning, his false statements were clearly material within the context of § 1001, and not the kind of trivial statements the materiality requirement was meant to exclude.

### IV.

Next, LeMaster contends that the trial court's exclusion of testimony from Senator Bradley as hearsay was prejudicial error. In an offer of proof, LeMaster's counsel stated that if Senator Bradley were permitted, he would have testified that the day after the interview with Special Agent Antle, LeMaster appeared in Bradley's office and stated that "he remembered placing 'bets' for Jay Spurrier." The trial judge excluded this testimony as irrelevant hearsay. Senator Bradley would have further testified that he told LeMaster that the placing of bets was "not

the kind of questions they were really inquiring about." The trial judge sustained an objection to this testimony stating that it expressed Bradley's state of mind which was irrelevant.

LeMaster argues that the testimony was relevant, non-hearsay evidence admissible on the issue of LeMaster's state of mind; that the statement was evidence of his confusion and his misunderstanding of certain questions at the interview. Alternatively, he argues that the statement was admissible under Fed.R.Evid. 803(3)[8] as an exception to the hearsay rule to prove that he did not "knowingly and willfully" make false statements during his interview.

■ We find, however, that LeMaster's statement, "I remember placing bets for Spurrier," made 24 hours after the interview, is not probative of LeMaster's state of mind the prior day. Nor does the statement tend to prove confusion or misunderstanding at his interview. The comment could, at best, support an inference that LeMaster responded to Antle's questions mistakenly, rather than knowingly and wilfully responding falsely. If so, the statement was being offered for its truth and thus was inadmissible hearsay. To be admissible under Rule 803(3) as an exception to the hearsay rule, the declarant must not have had an opportunity to reflect and possibly fabricate or misrepresent his thoughts. *United States v. Neely,* 980 F.2d 1074, 1083 (7th Cir.1992). As indicated, LeMaster made this statement the day after the interview when he knew he was under investigation and the FBI had tape recorded proof that he accepted cash from Spurrier. As an attorney familiar with criminal law, LeMaster knew that he had to have an inno-

---

7. There could well have been several reasons for accepting the cash. For example, at trial LeMaster's defense was that Spurrier gave him the money to place horse racing bets on Spurrier's behalf.

8. Rule 803 states in part:
 The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

 **(3) Then existing mental, emotional, or physical condition.** A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

cent explanation for accepting cash from Spurrier. He had 24 hours to think about an explanation, sufficient time to fabricate one. Thus, we find the trial judge did not err in excluding LeMaster's statement as inadmissible hearsay. Further, the trial court properly excluded Senator Bradley's response as irrelevant. Bradley's response evidenced his state of mind concerning the FBI's interview, not LeMaster's. The trial court did not abuse its discretion in excluding this testimony.

## V.

■ LeMaster also appeals his sentence contending that, under the circumstances here, an upward departure was unwarranted and, further, a 12–month custodial sentence, twice the applicable range for a § 1001 offense, was unreasonable. In granting the government's motion for an upward departure, the district judge found, by a preponderance of evidence, that LeMaster committed attempted extortion and violated § 1001 to conceal his offense. The court's upward departure was based upon § 5K2.9 which provides:

If the defendant committed the offense in order to facilitate or conceal the commission of another offense, the Court may increase the sentence above the guideline range to reflect the actual seriousness of the defendant's conduct.

In this connection, an acquittal does not require the court to ignore otherwise relevant conduct, *United States v. Lloyd*, 10 F.3d 1197, 1221 (6th Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 1569, 128 L.Ed.2d 213 (1994), and it is sufficient if the offense being concealed is established only by a preponderance of the evidence. *United States v. Durham*, 941 F.2d 858, 864 (9th Cir.1991).

■ We review sentences that depart from the applicable guideline range by employing a three-step analysis: 1) after a plenary review, we determine whether the circumstances considered by the sentencing court are sufficiently "unusual" to justify the departure; 2) we determine whether the circumstances considered are supported by the facts; (since this determination involves a factfinding process, the sentencing court's

determinations will be reversed only if clearly erroneous); and 3) we consider whether the extent of the departure was reasonable. *United States v. Joan*, 883 F.2d 491, 494–96 (6th Cir.1989); *United States v. Heckman*, 30 F.3d 738, 741 (6th Cir.1994).

■ LeMaster argues that guideline section 5K2.9 is inapplicable because the guidelines for violations of § 1001 include circumstances in which false statements are made for the purpose of concealing other crimes. We disagree. Commonly, violations of § 1001 are motivated by purposes other than the concealment of other crimes. *See, United States v. Rodgers*, 466 U.S. 475, 104 S.Ct. 1942, 80 L.Ed.2d 492 (1984) (Defendant, who did not know his wife's whereabouts, falsely reported she was involved in a plot to assassinate the President of the United States so the FBI would locate his wife was convicted for violating § 1001). The district court's finding that LeMaster made false statements to conceal his attempted extortion is sufficiently unusual to satisfy the first step of the *Joan* analysis. *United States v. Burns*, 893 F.2d 1343, 1346 (D.C.Cir.1990), *rev'd on other grounds*, 501 U.S. 129, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991) (upward departure warranted under § 5K2.9 where defendant committed tax evasion to conceal theft of government funds since tax evasion can be committed without concealing other crimes).

LeMaster next argues that there was no factual support for the court's finding that he violated the Hobbs Act. Again, we disagree. The district judge made this finding after considering Spurrier's testimony that he paid LeMaster large sums of money to influence his vote on the pending "breed to breed" legislation and that the money was not for "bets" since Spurrier would only bet $20–$40 on any given race. The court heard the tape recorded meetings between LeMaster and Spurrier each time Spurrier paid money to LeMaster. The court had the opportunity to evaluate Spurrier's credibility and demeanor. The court also had the opportunity to evaluate the tape recorded interview of LeMaster by the FBI. After considering all of the evidence the court found that LeMaster knew the money was given to him to influ-

ence his official acts as Chairman of the BOP Committee. In view of this evidence, the trial court was not clearly erroneous in finding by a preponderance of evidence that LeMaster violated the Hobbs Act and made false statements to conceal his violation.

Lastly, it is for the sentencing court to determine the extent of the departure based upon the totality of the circumstances. The trial judge's determination should be given great deference unless we can say that there is no basis for the departure. *United States v. Joan,* 883 F.2d at 496; *United States v. Durham,* 941 F.2d at 862.

The district court found that LeMaster's act of lying to the FBI to conceal another criminal act was analogous to his being an "accessory after the fact" to a Hobbs Act violation.[9] We find there was a sound, factual basis for this determination. The court then calculated the sentence based upon an offense level of 12, resulting in a 12–month sentence, 6 months greater than the guidelines provide for a § 1001 violation.[10] The court, in sentencing LeMaster to 12 months' confinement, considered the seriousness of LeMaster's offense; the violation of his obligation as a public official and the need for deterrence. In view of these considerations, we cannot say that the extent of the departure was unreasonable.

### VI.

 LeMaster finally contends that the guilty verdict on count III is inconsistent with his acquittal on count I and must be reversed. There is no merit to this contention. In our view, the jury verdicts are not inconsistent and irreconcilable. In any event, the court in *United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984) held that inconsistent verdicts provide no basis for reversal. We have applied this rule in our circuit in *United States v. Martin,*

897 F.2d 1368, 1373 (6th Cir.1990) ("[a] defendant may not upset a verdict solely because the verdict is not reconcilable with other verdicts for or against the defendant."). Defendant's focus on the use of the word "solely" in the *Martin* opinion is misguided in light of the Supreme Court's decision in *Powell.*

The judgment is affirmed.

NATHANIEL R. JONES, Circuit Judge, dissenting.

I agree with my colleagues that this court has not yet been required to explicitly adopt or reject the "exculpatory no" doctrine. *See* Maj. Op. at [1229]. As with previous panels of this court, the majority here simply declines to apply the doctrine, based on its conclusion that "the doctrine does not apply to the facts now before us." Maj. Op. at [1230]; *see also United States v. Steele,* 933 F.2d 1313, 1315 (6th Cir.) (en banc) ("We decline to apply the doctrine to the facts in this case and find it unnecessary to decide whether the doctrine is viable in other circumstances"), *cert. denied,* 502 U.S. 909, 112 S.Ct. 303, 116 L.Ed.2d 246 (1991); *United States v. Duranseau,* 19 F.3d 1117, 1122 (6th Cir.1994) (declining to apply "exculpatory no" doctrine in case).

I dissent, however, for two reasons. First, I wish to renew the objections, voiced by the dissenters in *United States v. Steele,* to this court's refusal to adopt the doctrine. *See Steele,* 933 F.2d 1313 at 1326–27 (Brown, J., dissenting) (joined by Keith, Jones, Krupansky, JJ.) (arguing that this court should adopt Ninth and Fourth Circuits' formulation of "exculpatory no" doctrine); *id.* at 1327 (Merritt, C.J., dissenting) (concurring in Judge Brown's dissenting opinion); *id.* at 1328 (Martin, J., dissenting) (agreeing that this court should adopt Ninth and Fourth Circuit's formulation of "exculpatory no" doctrine). Second, I dissent because I believe that the doctrine does apply to the facts of this case.

---

9. An accessory before or after the fact is no longer used to describe criminal conduct. Now, 18 U.S.C. § 2 provides that one who "aids and abets" or "causes" the commission of an offense is punishable as a principle. But the mere fact that the old term is used to describe the criminal conduct does not affect the result.

10. The court reached this offense level by starting with a base offense level of 10 for a Hobbs Act violation, pursuant to U.S.S.G. § 2C1.1(a). Eight points were then added pursuant to § 2C1.1(b)(2)(B) because the offense related to bribing an elected official, and 6 points were subtracted pursuant to § 2X3.1 for being an accessory after the fact.

**1234**

My colleagues recognize that the majority of the federal circuits have adopted the "exculpatory no" doctrine in various forms. Maj. Op. at [1227–28]. In *Steele*, I joined Judge Brown's thoughtful dissent, urging that this court adopt the formulation of the Ninth Circuit, which the Fourth Circuit also followed. 933 F.2d at 1326–27. As my colleagues further note, the Eighth and Tenth Circuits have also adopted the Ninth Circuit's formulation. Maj. Op. at [1228–29]. Each of these circuits apply the following five-part test to determine whether the "exculpatory no" doctrine applies to a given set of facts:

1) the false statement must be unrelated to a claim to a privilege or a claim against the government;

2) the declarant must be responding to inquiries initiated by a federal agency or department;

3) the false statement must not impair the basic functions entrusted by law to the agency;

4) the government's inquiries must not constitute a routine exercise of administrative responsibility; and

5) a truthful answer would have incriminated the declarant.

*Steele*, 933 F.2d at 1320, 1327; *see United States v. Equihua–Juarez*, 851 F.2d 1222, 1224 (9th Cir.1988); *United States v. Cogdell*, 844 F.2d 179, 183 (4th Cir.1988); *see also United States v. Taylor*, 907 F.2d 801, 805 (8th Cir.1990).

I believe that this formulation of the doctrine is necessary to effectively limit the sweeping scope sometimes given to 18 U.S.C. § 1001. *See Steele*, 933 F.2d at 1325 (Brown, J., dissenting) ("[I]f read literally, [this statute] could make virtually any false statement, sworn or unsworn, written or oral, made to a Government employee ... a felony.") (citations and quotations omitted). Moreover, I respectfully submit that my colleagues' and the *Steele* majority's suggestion that "prosecutorial discretion provide[s] sufficient limitations on the application of [18 U.S.C. § 1001]," Maj. Op. at [1229–30] (citing *Steele*, 933 F.2d at 1321), is wholly inadequate.

Finally, I believe that the "exculpatory no" doctrine applies to the facts of the present case. LeMaster responded "No sir" to the officers' various inquiries. *See* Maj. Op. at [1227–28]. The majority believes, however, that LeMaster's selective listing of gratuities, which he accepted, constituted false statements for purposes of 18 U.S.C. § 1001. This, in my opinion, gives new meaning to the phrase, "Anything you say can and will be used against you in a court of law." *See, e.g., Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). While Mr. LeMaster obviously had no constitutionally protected right to perjure himself or obstruct justice, the Fifth Amendment protected LeMaster's right to decline to offer—voluntarily or as a result of compulsion—statements that would be self-incriminating. Thus, the "exculpatory no" doctrine should have been applied in this case.

I respectfully **dissent.**